IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| JEAN E. HAUETER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 04-3221-CV-S-HFS |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This is a proceeding involving an application under Title II of the Social Security Act (the Act). 42 U.S.C. §§ 401, et seq. Plaintiff Jean E. Haueter seeks review of the Commissioner's decision denying her application for a period of disability and disability insurance benefits. Plaintiff's application was denied initially. Tr. 40-45. Plaintiff appealed the denial to an administrative law judge (ALJ). After an administrative hearing, the ALJ issued her written decision on March 17, 2004, in which she determined that plaintiff was not "disabled" as defined in the Act. Tr. 17-29. The Appeals Council of the Social Security Administration denied plaintiff's request for review on May 25, 2004. Tr. 5-7. Accordingly, the decision of the ALJ now stands as the final decision of the Commissioner. Plaintiff's appeal is currently before this court pursuant to 42 U.S.C. §§ 405(g).

I.   **Factual Background**

The facts are fully presented in the parties' briefs and will thus be merely summarized here. On November 27, 2001, plaintiff filed an application for a period of disability and disability insurance benefits. Tr. 52-54. Plaintiff alleges a disability onset date of May 7, 2000, due to

impairments and surgeries on her right shoulder and left knee and resulting chronic pain. Tr. 89.

Plaintiff's Testimony

Plaintiff was born on April 17, 1955 and was 47 years old at the time of the hearing. Tr. 243. She is a high school graduate and is right-handed. Tr. 243. Plaintiff has had total left knee replacement surgery (in July 2001) and also has some damage to her right knee. Tr. 244. (The ALJ noted that plaintiff was limping when she walked in to the hearing.) She uses a cane depending on where she is, what she is doing and whether she is having a good day or a bad day. She uses her cane if she goes shopping, if it is a cold bad day, if she is going to be on uneven surfaces, or if she is going to do a lot of walking. Tr. 244-45. Plaintiff is able to drive but she sometimes has difficulties depending on the length of the trip, because she can only sit for so long. Tr. 245. When driving in heavy traffic, her shoulder and neck bother her. Tr. 245. She also has trouble getting in and out of her car because her knee will not bend all the way. Tr. 245.

After her alleged disability onset date of May 7, 2000 and before her knee replacement, she worked part time at U.S. Cellular for 7 or 8 months (fall of 2000 through early spring of 2001), describing it as "hit and miss" type of work. Tr. 245-46. She last saw Dr. William Wester, an orthopedic surgeon, in September 2002. She is being treated for depression by Dr. Stupi, her gynecologist, who put her on medication (Prozac). Tr. 246. She sees him every four months to check on the depression medication; she does not have any side effects from the medication. Tr. 246-47. Before working for U.S. Cellular, plaintiff sold newspaper advertising. Tr. 247. She left that job because she had to get in and out of her car 40 times a day and because of walking, traveling and carrying a briefcase (apparently the job was physically taxing). Tr. 247. In the U.S. Cellular job, she worked inside and could sit or stand, but she had difficulty squatting and kneeling. Tr. 247.

The company wanted her to go to schools and businesses to sell phones, but she could not do that. Tr. 247.

Since her left knee replacement, she has had problems bending the knee due to keloid scars; her knee problem dates back to her childhood and affects her tendons and muscles as well. Tr. 248. She has seen a doctor (not an orthopedist) about her right knee, and he thinks she has a tear in it. Tr. 248. She has ongoing, constant pain in her right knee due to overuse in compensating for her left knee condition, and it makes her very unsteady. Tr. 248-49. Plaintiff has had two surgeries on her right shoulder (stemming from a fall at work in September 1997)[1] and still has constant pain, aching and very limited movement. Tr. 249. Using her right arm, she can pick things up but she cannot carry anything over 10 pounds for any length of time. Tr. 249. She can lift her right arm above shoulder height, but has problems doing so; she has trouble "fixing my hair, blow drying it, curling it, putting makeup on, it's difficult for me." Tr. 249-50. She does not have any difficulty with her left arm or shoulder. Tr. 250. She does have some stiffness and "a little bit of arthritis" in her hands. Tr. 250.

In addition to persistent pain in her knees and her right shoulder, plaintiff has pain in her hips, especially her right hip, because one leg is an inch shorter than the other as a result of the left knee replacement. Tr. 250. She also has pain in the base of her neck into her shoulder, as well as pain in her lower back. Tr. 250-51. She thinks her neck and lower back pain stem from her fall at work when she injured her shoulder, though the cause of that pain was not diagnosed at the time. Tr. 251. She went to a chiropractor in November 2002, who took an x-ray which showed an old

---

[1] Plaintiff's worker's compensation claim is resolved, but her second injury fund claim was still unresolved as of the hearing date. Tr. 255.

3

fracture on the T3 vertebra at the base of her neck. Tr. 251. She has constant pain and aching in her neck and lower back. Tr. 251.

Plaintiff has not worked since the spring of 2001. Tr. 252. On a typical day, she gets up, makes the bed, gets dressed, watches the morning news on television, and does some light picking up around the house. Tr. 252. She needs assistance with any deep cleaning and cannot vacuum, mop squat or kneel, so her two daughters come over to her help with those tasks. Tr. 252. She is able to fix meals, and she does the laundry for herself and her husband, but she cannot carry clothes baskets. Tr. 252. She goes grocery shopping once every week or two, which she described as a "major ordeal" because of "[t]he walking, the picking stuff up, carrying the groceries in, putting them away." Tr. 253. She usually has one of her daughters or her husband go with her, because she needs help. Tr. 253. If she goes to Wal-Mart and needs a lot of stuff, she will get a wheelchair with a basket on the front. Tr. 253.

During the day, she needs to lie down or recline. Tr. 253. If she is sitting for 10 minutes or more, she sits in her recliner and has to put her legs up to about waist height, because sitting and letting her legs hang is too uncomfortable. Tr. 253. When she worked for Marshfield Publishing and when she did bookkeeping work, she used a stool to keep her legs up. Tr. 254. In addition to watching television and reading, plaintiff does some embroidery "in little spurts" because her shoulder gets fatigued easily. Tr. 254. She is able to plant flowers but has to sit on the ground to do so, which makes it difficult; to get up off the ground she uses a chair or someone to help her stand up. Tr. 255. She can only work on the computer for 15 or 20 minutes until her shoulder, neck and hips begin to hurt. Tr. 255. She goes to church maybe twice a month, but she cannot sit for the whole service and has to get up. Tr. 255. She has to climb steps to get into her home, but she has

4

difficulty with stairs and does not have stairs in her home. Tr. 256. She can stand for about 5 minutes before needing to sit down. Tr. 256. She can sit in her recliner with her legs elevated for about 20 to 30 minutes before needing to readjust or stand up. Tr. 256. If she had to sit in a straight-back chair without her legs up, she could only sit for about 10 minutes. Tr. 256. She can walk for between a block and a mile, depending on how she feels and the weather. Tr. 257. She explained that she is in a lot of pain and/or aching most of the time. Tr. 257. "Everything and anything I do pretty much hurts, or I pay for it later." Tr. 257. She has difficulty focusing on reading or watching television, as the pain breaks her concentration and she has to get up, move or readjust. Tr. 258.

The ALJ noted that plaintiff had been working with Vocational Rehabilitation to see about retraining for a job that would allow her to sit primarily. Tr. 258. Plaintiff said she had contacted them, but they wanted her to go through some training and physical testing, and she did not feel up to it at the time, so she did not pursue it. Tr. 258. With regard to one leg being longer than the other, plaintiff has never talked to a doctor about evening them up with a shoe insert or otherwise. Tr. 259. Her limping has increased the pain in her knees and hips, but no doctor has spoken to her about her limp. Tr. 259. She saw Dr. Muchler in June or July of 2002 about her knee replacement and her continuing problems with the scar tissue, but he told her there was not much that could be done given the damage to her muscles and ligaments because it was such an old injury. Tr. 259. He told her that additional surgery might be an option, but he could not guarantee anything and she did not have insurance to cover it. Tr. 259-60.

## II. Standard of Review

The scope of this court's review is defined by the Act, which provides that the Commissioner's decision is conclusive if supported by substantial evidence on the record as a whole.

5

Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989); Bates v. Chater, 54 F.3d 529, 531 (8th Cir. 1995); Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995); Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The court will evaluate the entire record, considering not only the evidence which supports the Commissioner's decision, but also that which fairly detracts from it. Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996); Johnson v. Shalala, 42 F.3d 448, 451 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991). The court will not, however, reverse a decision simply because substantial evidence may support the opposite conclusion. Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995). The court must be satisfied that the ALJ performed her duty to fully and fairly evaluate all the evidence before her. Herbert v. Heckler, 783 F.2d 128, 130-31 (8th Cir. 1986).

**III.  Analysis**

The Social Security Administration has established a five-step sequential evaluation process for determining disability. 20 C.F.R. §§ 404.1520, 416.920. Step one requires a determination as to whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments as defined in 20 C.F.R. § 404.1520(c). If so, the ALJ should proceed to step three, which asks if the impairment or combination of impairments meets or equals one of a list of specific impairments set out in the regulations. 20 C.F.R. § 404.1520(d). If this requirement is met, the claimant is conclusively presumed disabled; if not, the ALJ should proceed to step four. At step four, the ALJ determines

whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(e). If the claimant can perform such work, she is not disabled. If the claimant establishes that she is incapable of performing her past relevant work, the ALJ must show, at step five, that the claimant can perform other substantial gainful work that exists in the national economy. 20 C.F.R. § 1520(f).

In this case, the ALJ proceeded through step four, at which point she concluded that plaintiff could return to her past relevant work as a bookkeeper. In the alternative, the ALJ proceeded to step five and concluded that plaintiff could perform other work in the national economy and therefore was not eligible for disability insurance benefits under the Act. She determined that plaintiff has the following medically determinable physical and mental impairments:

> Right shoulder disorder, status post right rotator cuff repair, with some ongoing pain complaints; left knee disorder, status post total knee replacement, with some ongoing pain complaints; sciatica, with pain complaints involving her upper and low back, bilateral knees, and hips; and non-severe depression (further specified below).

Tr. 24. The ALJ found that these impairments (except depression) were severe within the meaning of the Regulations, but concluded that they did not meet the criteria set forth in the Listing of Impairments. Tr. 24; see 20 C.F.R. § 404, Subpart P, App. 1. Based on the testimony of a vocational expert, the ALJ found that plaintiff is able to perform her past relevant work as a bookkeeper. Tr. 26-27. Alternatively, the ALJ determined that plaintiff even if plaintiff could not return to her past relevant work, she possesses the residual functional capacity to perform other work which exists in significant numbers in the economy, and thus is not disabled. Tr. 27.

Plaintiff raises three points of error. She claims that the ALJ: (1) erred in finding plaintiff not disabled at step four, and in improperly applying the Medical-Vocational Guidelines in finding plaintiff not disabled at step five; (2) improperly formulated plaintiff's residual functional capacity and omitted certain restrictions from the hypothetical posed to the vocational expert; and (3) erred

7

in finding that plaintiff's testimony was not credible. The court will first review the ALJ's credibility determination, as it appears to be dispositive.

### A. Plaintiff's Credibility

Plaintiff argues that the ALJ erred in finding that her subjective complaints were not credible. The Social Security Regulations provide that statements about a claimant's pain, alone, will not establish that an individual is disabled. 20 C.F.R. § 404.1529(a). There must be medical signs or laboratory findings which reveal a medically determinable impairment. 20 C.F.R. § 404.1529(b). Further, the impairment must "reasonably be expected to produce the pain or other symptoms alleged." Id. Once the medical signs and laboratory findings show that there is a medically determinable impairment that could reasonably be expected to produce pain, the intensity of that pain should be evaluated. 20 C.F.R. § 404.1529(c). In evaluating the intensity and persistence of a claimant's pain, the ALJ must reflect on all of the available evidence, including observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); see also 20 C.F.R. § 404.1529(c)(2). Other relevant factors include the claimant's work history and the absence of objective medical evidence to support the complaints. Polaski, 739 F.2d at 1322.

The first step in evaluating credibility, then, is to consider whether there is a medically determinable impairment that could reasonably be expected to produce pain. The objective medical evidence supports the conclusion that plaintiff suffers from some pain, as evidenced by the ALJ's enumeration of plaintiff's severe impairments, including "[r]ight shoulder disorder, status post right

8

rotator cuff repair, with some ongoing pain complaints; left knee disorder, status post total knee replacement, with some ongoing pain complaints; sciatica, with pain complaints involving her upper and low back, bilateral knees, and hips." Tr. 24. With regard to plaintiff's allegations of disability and limitations on her residual functional capacity that she attributes to her pain, the ALJ found that plaintiff's subjective complaints were not credible. Tr. 26.

Subjective complaints of pain may only be discounted if inconsistencies are apparent in the evidence "as a whole." Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998). Here, the ALJ noted several factors which led to her determination that plaintiff's subjective complaints were not credible: (1) no treating physician has opined that plaintiff is disabled or otherwise unable to work; (2) plaintiff takes over-the-counter medications for pain; (3) plaintiff has not been seen for orthopedic care or follow-up since Dr. Wester examined her in September 2002; (4) plaintiff's daily activities are not inconsistent with an ability to perform a limited range of sedentary work; (5) plaintiff's allegation that she needs to recline and elevate her legs is not supported by the medical evidence; and (6) plaintiff's limitation in overhead reaching with her right arm would not explain her alleged inability to put on makeup due to that limitation. Tr. 25-26. Based on these factors, the ALJ found that plaintiff had exaggerated her symptoms and that plaintiff's allegation of being disabled was not credible. Tr. 26. While some of these factors may cut against plaintiff's credibility, the ALJ draws unwarranted conclusions as to several important factors.

With regard to pain management, the ALJ noted that plaintiff only took over-the-counter medications for pain. Notably, the ALJ drew this information from plaintiff's submissions to the Social Security Administration. The information in plaintiff's submissions is incomplete and outdated. In her Claimant Questionnaire signed May 14, 2002, plaintiff indicated that she took

9

Ibuprofen for pain, but did not indicate the dosage or how often she took it. Tr. 89. On a Claimant's Medications form dated August 6, 2002, she indicated that she took Tylenol and Tylenol PM; again, there is no information about dosage or how often she took it. Tr. 95. Finally, in an undated Statement following her request for a hearing (likely submitted shortly after her August 6, 2002 hearing request), plaintiff indicated that she was taking Tylenol and Ibuprofen, but did not indicate dosage or frequency of use. Tr. 94. Thus, the latest submission was made roughly 15 months before the hearing on November 4, 2003.

Despite the incomplete and dated nature of the pain medication information, at the hearing, the ALJ did not inquire about plaintiff's pain medications at all. The ALJ has a duty to fully and fairly develop the record. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Here, the ALJ failed to fully and fairly develop the record as to plaintiff's pain medications by failing to ask a single question on that topic.[2] The ALJ should have inquired as to plaintiff's then-current pain medications, including the type, dosage, frequency of use, effectiveness and side effects. Without that information, the ALJ was premature in concluding that plaintiff's use of over-the-counter pain pills cut against her credibility. As this court has observed in other cases, large doses of over-the-counter pain pills taken several times a day might well constitute a dosage on par with prescription pain medication and would also go a long way toward corroborating plaintiff's allegations of significant and consistent pain. Thus, plaintiff's use of over-the-counter pain medications does not diminish her credibility.

---

[2]This is a critical misstep, as plaintiff's allegation of disability rests largely on her complaints of constant and severe pain. The ALJ's failure to ask about pain medications is especially odd, given that the ALJ did ask plaintiff questions about the antidepressant she was taking and whether she had any side effects from it. See Tr. 246-47.

10

The ALJ also noted that plaintiff had not been seen for orthopedic care or follow-up since Dr. Wester examined her in September 2002. Here, the ALJ seems to imply either that plaintiff has failed to seek appropriate treatment or does not need such treatment. The evidence of record shows otherwise. On September 25, 2002, more than a year after her July 2001 left knee replacement, plaintiff reported to Dr. Wester that she still had pain and stiffness. Tr. 235. Dr. Wester noted that plaintiff's pain "appears to be laterally with flexion at the knee." Tr. 235. He also noted, "I have let her know that she will probably continue to have some improvement, although she is reaching what I would consider her long-term state. Unfortunately, due to her tendency toward keloid forming and scarring, I think she is going to have some stiffness in the knee, and I think most of her pain laterally is due to stiffness." Tr. 235. Dr. Wester anticipated seeing plaintiff in 2 years for x-rays. Tr. 235. Dr. Wester's reference to plaintiff's stiffness and pain being part of her "long-term state" and the absence of a recommendation for any more treatment demonstrate that, from his perspective, there was nothing more medically to do. Plaintiff would just have to deal with the stiffness and pain.

Moreover, plaintiff testified that she did seek a second opinion about the continuing problems with her left knee from Dr. Muchler in Lebannon, Missouri. Tr. 259. Dr. Muchler told there was not much that could be done given the damage to her muscles and ligaments because it was such an old injury. Tr. 259. He indicated that additional surgery might be an option, but said that he could not guarantee anything. Tr. 259-60. Even if plaintiff had wanted to take a gamble on yet another knee surgery (and risk even more keloid scarring), she testified that she did not have insurance to cover such surgery. Tr. 259-60. Under the circumstances, plaintiff's lack of orthopedic care or follow-up since September 2002 does not cut against her credibility.

In addition, the ALJ also noted that plaintiff's daily activities were not inconsistent with an ability to perform a limited range of sedentary work. The court disagrees. Plaintiff's daily activities include making the bed, getting dressed, watching television, reading, embroidery (but only in little spurts due to shoulder pain), light picking up around the house (but no vacuuming, mopping, squatting or kneeling), some laundry (but she cannot lift a clothes basket), cooking, shopping for groceries twice a month (but usually with her husband or daughter to help her), and attending church. Watching television and reading (which appear to occupy the bulk of plaintiff's days) do not require exertion, and plaintiff is able to sit down, lie down, stand up or alternate positions as necessary to relieve her pain. Although some of her other activities require exertion, it is minimal, and any of the activities could be left undone or put off if plaintiff is not physically up to the task. Not so with a full-time job. As the Eighth Circuit recently explained: "[W]e must guard against giving undue evidentiary weight to a claimant's ability to carry out the activities incident to day-to-day living when evaluating the claimant's ability to perform full-time work." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005).[3] Moreover, "this court has repeatedly observed that 'the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.'" Id. at 923 (citing Burress v. Apfel, 141 F.3d 875, 881 (8th Cir. 1998). Here, plaintiff's minimal daily activities do not demonstrate the

---

[3] The limited daily activities of the plaintiff in Reed are quite similar to those of plaintiff in this case. See Reed, 399 F.3d at 923 (noting that "she does 'a little bit of crafts,' but within an hour she is frustrated because of her inability to concentrate; she can make the bed, but not put on fitted sheets; she can do household chores, but cannot vacuum the floor or clean the bathtub; she can do the laundry but cannot carry the laundry basket; and, while she can go grocery shopping, she does so only 'if forced,' only with her mother-in-law, and only as long as they do not stay long."). Ultimately, the Eighth Circuit found that the plaintiff's daily activities were not inconsistent with her alleged disability. Id. at 923-24.

capacity for an 8-hour-a-day, 40-hour-a-week job. Therefore, plaintiff's daily activities are not inconsistent with her disability allegation and do not cut against her credibility.

The ALJ also stated that plaintiff's limitation in overhead reaching with her right arm would not explain her alleged inability to put on makeup due to that limitation. Plaintiff's testimony was that with regard to "fixing my hair, blow drying it, curling it, putting makeup on, it's difficult for me." Tr. 250. While this testimony followed any earlier question about lifting her right arm above shoulder level, plaintiff's testimony was in fact a response to the following question: "About fixing your hair, brushing your hair, brushing your teeth, is that – with you being right-handed, is that a problem or not a problem?" Tr. 250. Also, it is possible that depending on what type of makeup plaintiff was applying to what area of her face, reaching above shoulder level might be required. Even if the ALJ's characterization of plaintiff's testimony is correct, it represents at most an insignificant inconsistency in the testimony, not an indication that plaintiff's testimony was not credible.

Plaintiff also argues that the ALJ failed to recognize her solid work history and earnings record, which qualified her for benefits from May 2000 through September 2006. Tr. 63. The record reflects that plaintiff reported earnings every year since 1983, so she had been gainfully employed for about 17 years prior to her alleged disability onset in 2000. Tr. 64. Notably, plaintiff's earnings for the years 1994 through 2000 ranged roughly from $10,000 to $20,000; in 1999, she earned $20,108.89. Tr. 64. As defendant notes, the ALJ was not required "to discuss methodically each Polaski consideration." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). That said, plaintiff's work history and earnings record certainly weigh in favor of finding her to be credible.

In conclusion, it appears that the ALJ did not carefully review the record in making her assessment regarding plaintiff's credibility. Although no treating physician has declared plaintiff disabled and the medical evidence may not support the alleged need to lie down, the court finds that these two factors alone do not lead to the conclusion that plaintiff is not credible. And as explained above, when reviewing the entire record, the other remaining factors do not cut against plaintiff's credibility as the ALJ maintains. See Jackson, 873 F.2d at 1114 (citation omitted) (noting that "'[a]lthough the ALJ may reject testimony on the basis of credibility, such rejection must be supported by legitimate reasons for disbelief.'"). The court finds that the ALJ's credibility determination was not supported by substantial evidence on the record as a whole. Therefore, the ALJ's credibility determination was in error and should be reconsidered on remand.[4]

### B.     Other Points of Error

Plaintiff also argued that the ALJ erred in finding plaintiff not disabled at step four and in improperly applying the Medical-Vocational Guidelines in finding plaintiff not disabled at step five, and that the ALJ erred by improperly formulating plaintiff's residual functional capacity (RFC) and omitting certain restrictions from the hypothetical posed to the vocational expert. As noted above, the ALJ's credibility determination was not based on substantial evidence on the record as a whole. For this reason, the ALJ's determination that plaintiff could return to her past revelant work and the ALJ's formulation of plaintiff's RFC and the hypothetical are also in doubt. On remand, the ALJ should first reevaluate plaintiff's credibility and then reconsider the formulation of plaintiff's RFC as well as the hypothetical question posed to the vocational expert.

---

[4]There are, of course, degrees of credibility and this can be reexamined on remand.

The court also has some unresolved questions about plaintiff's treatment for depression and the severity of that impairment. Unfortunately, the record on plaintiff's depression is extremely limited, consisting of plaintiff's brief testimony that her gynecologist Dr. Stupi is treating her for depression and a single reference to plaintiff taking Prozac appearing in a July 7, 2003 report by a non-treating doctor. Tr. 246-47, 224. The record does not contain any medical records from Dr. Stupi. At the hearing, the ALJ did not ask plaintiff whether her depression medication was effective or whether her depression created any functional difficulties. On this very limited record, the ALJ somehow concluded that plaintiff's depression was non-severe. That conclusion may well be in error. Because remand affords additional time for investigation, the ALJ should fully and fairly develop the record regarding plaintiff's depression by requesting the medical records from Dr. Stupi pertaining to plaintiff's treatment for depression, and if practical, by specifically eliciting Dr. Stupi's opinions as to the limitations and restrictions posed by that impairment.

**IV.     Conclusion**

Based on the foregoing discussion, it is hereby

ORDERED that plaintiff's motion for summary judgment (ECF doc. 15) is GRANTED. The decision of the Commissioner is reversed and this case is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this order. The clerk is directed to enter judgment for plaintiff and against defendant.

/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

September 14, 2006

Kansas City, Missouri

15

Case 6:04-cv-03221-HFS   Document 22   Filed 09/14/06   Page 15 of 15